## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

      Plaintiff,

    v.

MARC DEMANE DEBIH,

      Defendant.

**Civil Action No. 21-cv-10138**

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

Plaintiff United States Securities and Exchange Commission ("the Commission"), for its

Complaint against Defendant Marc Demane Debih ("Debih"), alleges as follows:

### SUMMARY OF THE ACTION

1.      Beginning in 2011 and continuing through at least 2017, Defendant Marc Demane

Debih traded on inside information and tipped others ahead of numerous market-moving

corporate announcements in an international insider trading ring that generated tens of millions

in illicit profits for the participants, with Debih himself netting at least $49 million.

2.      Debih was a central figure in at least two separate schemes to trade on inside

information.  First, between at least December 2012 and at least August 2015, while working as

investment bankers in London, England, Benjamin Taylor and Darina Windsor illegally tipped

inside information to others, including Debih.[1]  During that period, while engaged in a romantic

relationship, Taylor and Windsor carried out the scheme (the "Taylor/Windsor Tipping

---

[1] The Commission filed a separate civil action in this Court against Taylor, Windsor and certain traders. *See* First Amended Complaint, *SEC v. Taylor, Windsor, et al.,* 19-cv-09744 (LAP) (filed March 27, 2020) (ECF No. 15). Debih is referenced as "Trader A" in the First Amended Complaint.

Scheme") by misappropriating from their respective employers material nonpublic information concerning impending corporate transactions (such as mergers, acquisitions, and tender offers) and tipping such commercially sensitive information to Debih in exchange for cash. Debih, who both used the information to trade securities and tipped others to trade, received millions of dollars in proceeds from the illegal securities transactions.

3.     Beginning in at least December 2012, Taylor obtained material nonpublic information about corporate transactions from the investment bank at which he was employed ("Investment Bank 1") and on more than one occasion, through an intermediary, tipped this information to Debih for use in trading securities. Debih, in turn, tipped the material nonpublic information to his friend George Nikas ("Nikas") in exchange for a share of the profits that Nikas generated trading on these tips.

4.     Beginning in at least February 2013, Taylor, through an intermediary, also tipped Debih with material nonpublic information that Taylor obtained from his girlfriend Windsor, who worked at a different investment bank ("Investment Bank 2"). Debih used the tips to place profitable trades and further provided those tips to Nikas in exchange for a share of the profits that Nikas generated trading on these tips. Debih also tipped two traders– Tomer Feingold ("Feingold") and Dov Malnik ("Malnik") – who also traded profitably on the tips that originated from Taylor and/or Windsor.[2]

5.     Based on the tips that Windsor and Taylor provided, Debih realized millions in illicit gains from trading the securities of at least a dozen different public companies in advance of news that these companies had been targeted for acquisition in contemplated or agreed upon corporate deals.

---

[2] The Commission filed a separate civil action in this Court against Malnik and Feingold. *See* First Amended Complaint, *SEC v. Feingold and Malnik*, 20-cv-1881 (LAP) (ECF No. 27). Debih is referenced as "Trader A" in the First Amended Complaint.

6.     In addition to the Taylor/Windsor Tipping Scheme, between in or about April 2015 and in or about November 2017, Debih actively participated in a second insider trading scheme involving former investment banker Bryan Cohen ("Cohen") (the "Cohen Tipping Scheme").[3]

7.     From at least 2015 through 2017, Cohen, who was employed at a large international investment bank ("Investment Bank 3"), participated in the scheme by misappropriating from his employer material nonpublic information concerning impending corporate transactions.  Cohen directly or indirectly tipped the information to Debih, who used it to trade securities.  Debih further tipped the corporate deal information to Nikas, who also used it to illegally trade securities.

8.     Based on the tips that Cohen provided, Debih and Nikas realized millions of dollars in illicit gains from trading the securities of at least two different public companies—Syngenta AG ("Syngenta") and Buffalo Wild Wings, Inc. ("Buffalo Wild Wings")—in advance of news that these companies had been targeted for acquisition in contemplated or agreed upon corporate deals.

9.     At all relevant times, the common stock of each company referenced herein was registered with the Commission under Section 12(b) of the Exchange Act.  At all relevant times, the securities of each company traded on United States securities exchanges, including the New York Stock Exchange ("NYSE") and the NASDAQ Stock Market ("NASDAQ").  Both NYSE and NASDAQ are located in New York, New York.

10.     By knowingly or recklessly engaging in the conduct described in this Complaint, Debih violated, and unless restrained and enjoined will continue to violate, Sections 10(b) and

---

[3] In connection with this scheme described herein, Cohen and Debih's tippee, Nikas, were charged in a separate civil action.  *See SEC v. Cohen and Nikas*, 19-cv-9645 (CM).  Debih is referenced as "Trader A" in the Complaint.

14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

11.     The Commission brings this action under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].  The Commission seeks a permanent injunction against the Defendant to enjoin him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint;  civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and such other relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action under Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].  Certain of the acts, practices, transactions, and courses of business constituting the violations made use of a means or instrumentality of interstate commerce, or of the mails, and/or of the facilities of national securities exchanges.

13.     Venue in this District is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the Southern District of New York.

## DEFENDANT

14.     **Debih**, age 51, resided in Switzerland at all times relevant to this Complaint.

## DEFENDANTS IN RELATED CASES

15.     **Taylor**, age 38, is a native of France who resided primarily in the United Kingdom at all times relevant to this Complaint.  Between approximately February 2010 and May 2014, Taylor worked in the London office of Investment Bank 1, whose global headquarters

are in New York City.  Taylor worked for other investment banks before and after his employment with Investment Bank 1.

16.     **Windsor**, age 34, is a native of Thailand who resided in London from approximately 2010 to 2016.  Windsor worked at Investment Bank 1 from July 2010 through September 2012, where she met Taylor.  From September 2012 through January 2016, Windsor worked as an investment banker at the London office of Investment Bank 2, whose global headquarters are in New York City.

17.     **Nikas,** age 56, is a Greek citizen who previously owned a residence in New York, New York and owns a restaurant chain, "GRK Fresh," with restaurants in Manhattan.  Nikas also has a residence in Athens, Greece.

18.     **Cohen**, age 34, resides in France.  At all times relevant to the Complaint, Cohen was employed by Investment Bank 3.  Between 2010 and August 2017, Cohen worked in the London office of Investment Bank 3, whose global headquarters are in New York City.  In August 2017, Cohen transferred to the New York office of Investment Bank 3.  Investment Bank 3 provides financial advisory and other services to publicly traded companies in connection with strategic transactions, including business combinations such as mergers, acquisitions and tender offers.

19.     **Feingold**, age 42, is an Israeli citizen who resided primarily in Geneva, Switzerland.  Feingold attended college in the United States in or about 2003.

20.      **Malnik**, age 43, is an Israeli citizen who resided primarily in Geneva, Switzerland.  Malnik previously resided in New York, New York, and worked for a hedge fund in Geneva.  Malnik received his undergraduate degree in finance and international business in 2002 from a university in the United States.

## TYPES OF SECURITIES TRADED

21.     In connection with the schemes to trade on material nonpublic information tipped by Taylor, Windsor, and/or Cohen, Debih established "long" positions in companies that were targeted for acquisition by purchasing shares of common stock, options and other derivative financial instruments known as contracts-for-difference ("CFDs") and/or spread bets.  CFDs and spread bets are not traded in the United States, but are traded based on securities listed on U.S. exchanges, including NYSE and NASDAQ.

22.     A CFD is an agreement between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time at which it is closed. If the share price of the underlying stock increases, the seller pays the difference to the buyer; however, if the share price declines, the buyer must pay the seller.  A CFD thus mirrors the movement and pricing of its underlying stock on a dollar-for-dollar basis, such that any fluctuation in the market price of the underlying security is reflected in the unrealized gain or loss of the CFD position.  The purchase and sale prices of CFDs are identical to the prices quoted for the shares on the public exchange on which the underlying common stock is listed.

23.     An equity CFD purchaser typically initiates a long position in the same manner in which he or she would purchase common stock, by submitting an order with a CFD provider to buy a certain number of CFDs in a particular stock.  The CFD provider ordinarily purchases a corresponding number of shares of the underlying stock to hedge its position and writes the CFDs to the client at the same price.  As with stock transactions, the buyer is able to enter market, limit or stop loss orders when initiating CFD positions.

24.     Spread bets are another form of leveraged financial instrument that enable investors to wager on the price movement of an underlying security, such as the common stock of U.S. listed companies.  In the United Kingdom, spread bet contracts may be purchased in

increments of a particular number of "pounds per point," meaning that the purchaser profits that number of British pounds for each one cent price change in the underlying security.  As with CFDs, the profit or loss associated with spread bet contracts, after deducting the costs and fees charged by the firm, depend entirely on the price of the underlying stock as reflected in trades on the national securities exchanges in the United States.

25.     As set forth below, Debih purchased CFDs and/or made spread bets on U.S. companies through foreign brokerage firms.  These firms hedged their exposure by purchasing shares of the underlying companies on U.S. exchanges through domestic brokerage firms, or purchasing CFDs or spread bets through other foreign brokerage firms, which in turn purchased the shares of the underlying companies on U.S. exchanges through domestic brokerage firms.

## FACTUAL ALLEGATIONS

**A.     Taylor's and Windsor's Access to Material Nonpublic Information and Duties to Maintain Confidentiality**

26.     In or about 2010, Taylor and Windsor met while working together at Investment Bank 1 in London, England.  Both Taylor and Windsor worked on deal teams advising bank clients on confidential corporate transactions, including transactions involving publicly traded U.S. companies.

27.     In or about September 2012, Windsor left Investment Bank 1 and began working in a similar capacity in the London office of Investment Bank 2.

28.     Thereafter, Taylor and Windsor continued to communicate and socialize frequently via email, telephone, and in person.  For most (if not all) of the relevant time period, they also lived together.

29.     In connection with their employment at the respective banks, both Taylor and Windsor were subject to specific policies and procedures aimed at ensuring the confidentiality of

nonpublic information and preventing the misuse of such information for personal gain through securities trading or other means.

30.     As set forth below, Taylor and Windsor repeatedly violated these policies.  For example, in order to obtain the information supplied to Debih, Windsor and Taylor repeatedly accessed internal electronic files of their respective employers, including files concerning deals on which they were not staffed and for which they had no business reason to review.

**B.     Overview of the Taylor/Windsor Tipping Scheme**

31.     By at least early 2013, if not earlier, Taylor and Windsor participated in a fraudulent scheme to tip material nonpublic information to Debih for use in trading securities.

| | USD | | GBP | |
|---|---|---|---|---|
| Amount | 2,000,000 | | | |
| % | 20.0% | | | |
| | | | | |
| Profit | 400,000 | | | |
| Swiss | 200,000 | 50% | | |
| Mine | 100,000 | 50% | 66,667 | 1.5 |
| | | 100 | | 50 |
| Note | 1000 | | 1,333 | |

33.     Among other things, the spreadsheet calculates the amount of specific US and British currency, in denominations of hundred dollar bills and 50 pound notes respectively, required to make the requisite cash payment of Windsor's share of the trading proceeds.  The term "Swiss" in the above spreadsheet refers to the profits obtained by Debih (who was, at the time, living in Switzerland).

34.     Taylor and Windsor in fact received substantial cash payments and other benefits (such as watches, clothing, other luxury items, and travel) in exchange for the insider trading tips

to Debih.  Cash payments were routed from Debih to Taylor and Windsor through an intermediary in Europe.

35.     Beginning in at least late 2012, in addition to using Taylor's and/or Windsor's tips to trade securities, Debih tipped the inside information obtained from Taylor and/or Windsor to his friend Nikas in exchange for a share of the profits that Nikas generated trading on these tips.

36.     Nikas and Debih have known each other since at least early 2011, often communicating with each other via email and/or phone.  In or about May 2012, Debih traveled to New York City and stayed overnight at Nikas's apartment for several days.  In addition, on at least two occasions in 2013, Nikas provided to Debih illegal tips of material nonpublic information about discussions between U.S.-based biotechnology company Ariad Pharmaceuticals, Inc. ("Ariad") and the U.S. Food and Drug Administration ("FDA") concerning the safety and efficacy of Ariad's drug, Iclusig.  Nikas received this highly confidential information from a close friend whose father was a member of the Ariad board of directors. Both Nikas and Debih exploited this informational advantage to reap millions in profits by placing well-timed securities trades ahead of Ariad's public disclosures regarding clinical testing and marketing of Iclusig on October 9 and December 20, 2013, respectively.

37.     Beginning in 2013, Debih also began tipping material nonpublic information to Malnik and/or Feingold.

38.     In 2013, Debih and Feingold met while vacationing in Greece and discussed the prospect of working together to trade on inside information.  Feingold suggested that Debih meet his business partner, Malnik, who might also want to participate in the scheme.

39.     Shortly thereafter, upon returning to Switzerland from Greece, Debih contacted Malnik and the two discussed the insider trading scheme at a meeting in Geneva.  At that time, Debih and Malnik agreed only to communicate through "safe" methods that would be difficult to

detect—specifically, by talking in person, by using pre-paid "burner" telephones, or through encrypted application-based communications on mobile phones.

40.    Beginning in at least the summer of 2013, Debih began to provide illegal insider trading tips to Feingold and Malnik in exchange for a share of the profits that Feingold and Malnik generated trading on these tips.

**C.    Debih and Nikas Trade on Tips of Inside Information From Taylor About Deals Advised by Investment Bank 1**

41.    On multiple occasions beginning in or about December 2012, Taylor, through an intermediary, provided material nonpublic information to Debih concerning deals advised by his then-employer, Investment Bank 1, and Debih in turn passed the information to Nikas.

**Life Technologies**

42.    For example, in or about January 2013, Taylor, through an intermediary, tipped Debih about the potential acquisition of Life Technologies Corporation, a biomedical laboratory equipment maker based in Carlsbad, California.  Life Technologies' common stock traded on the NASDAQ under the ticker symbol LIFE.

43.    In or about April 2011, Life Technologies executed a multi-year confidentiality agreement with Investment Bank 1.  Among other things, Investment Bank 1 was involved in the process for evaluating the company's strategic alternatives.  Investment Bank 1 was formally retained as a financial advisor to Life Technologies in or about October 2012.

44.    Around November 10, 2012, the review of strategic alternatives was assigned the code name "Project Liberty" to maintain its confidentiality.  Life Technologies and Investment Bank 1 also utilized other procedures to safeguard the confidentiality of Project Liberty, including requiring potential buyers of Life Technologies to sign confidentiality agreements.

45.     During November and December 2012, Life Technologies' investment bankers, including Investment Bank 1, contacted potential buyers.  By the end of December 2012, six potential buyers signed confidentiality agreements with the company in order engage in further discussions regarding a potential transaction.

46.     On January 1, 2013, these six potential acquirers were granted access to an online data room to facilitate the confidential review of key documents and information regarding Life Technologies.

47.     Between at least January 7 and January 11, 2013, Taylor electronically accessed dozens of internal documents relating to Project Liberty and Investment Bank 1's work for Life Technologies, even though Investment Bank 1 had not assigned Taylor to work on the project. Among other documents, Taylor accessed the Project Liberty data room index, six confidentiality agreements executed by potential buyers, as well as PowerPoint presentations prepared for Life Technologies' management and board of directors, which referenced potential acquisition prices and other confidential, nonpublic information.  Taylor, directly or indirectly, tipped Debih about the potential acquisition of Life Technologies and provided him with confidential documents from the online data room.

48.     On January 11, 2013, and in the days thereafter, Nikas immediately began building a position in the securities of Life Technologies, based on tips from Debih, and bought thousands of shares and CFDs, as well as call options.

49.     On or about January 16 and 17, 2013, Debih provided to a reporter at a newspaper based in Canada confidential Life Technologies documents that Debih had obtained indirectly from Taylor.  These documents included the Project Liberty data room index, five of the six confidentiality agreements that Life Technologies entered into with potential buyers, and select pages from the PowerPoint presentations that Taylor had accessed.

50.     On January 17, 2013, Debih also purchased a large volume of Life Technologies CFDs in anticipation of the Canadian newspaper breaking the story of the potential Life Technologies acquisition.

51.     After the market closed on January 17, 2013, at approximately 5:45 p.m. EST, the Canadian newspaper published an article reporting that Life Technologies was engaged in a sale process and had hired financial advisors, including Investment Bank 1, to assist with the process. Citing "materials seen by the [Canadian newspaper]" and "documents seen by this newspaper," the article specifically mentioned four of the potential buyers by name and noted that they had signed confidentiality agreements which gave them access to a data room.  The article further disclosed the potential offering price range ($65-$75 per share) that was included in PowerPoint presentations that Taylor had accessed and that were provided to the Canadian newspaper by Debih.

52.     The next day, January 18, 2013, before the market opened, Life Technologies issued a press release acknowledging in part what the Canadian newspaper had reported – namely, that the corporation's board had retained Investment Bank 1 and another firm to assist with an annual strategic review.  Life Technologies' share price jumped in reaction to the news article and the press release, opening at $61.23 on January 18, an increase of $6.26 per share, or about 11%, from the prior day's closing price on January 17.  Volume of trading in the common stock of Life Technologies increased from 2.79 million shares on January 17 to over 16.39 million shares on January 18 – an increase of about 487%.

53.     On January 18, 2013, Debih sold his Life Technologies CFD position for a profit of approximately $1.2 million.  Also on January 18, 2013, Nikas liquidated his positions in Life Technologies and generated profits of approximately $186,000.

54.     Taylor, working through an intermediary, also tipped Debih with material nonpublic information related to Reliance Steel & Aluminum Company ("Reliance"), a company being advised by Investment Bank 1 in connection with the potential acquisition of Metals USA ("MUSA").  Between December 2012 and February 2013, Debih acquired a large volume of CFDs of MUSA, after having been tipped by Taylor through an intermediary about the potential acquisition.  On February 6, 2013, Reliance announced that it would acquire all outstanding shares of MUSA for $20.65 per share.  Debih profited approximately $369,000 from trading in MUSA based on the tips of material nonpublic information from Taylor.

**D.     Debih and His Tippees Trade on Tips of Inside Information from Taylor and Windsor About Deals Advised by Investment Bank 2**

55.     On multiple occasions beginning in or about February 2013 through in or about August 2015, Taylor, through an intermediary, also tipped to Debih material nonpublic information that Taylor obtained from Windsor, who misappropriated the information from Investment Bank 2.  Debih then tipped that material nonpublic information to Nikas, Malnik and Feingold.

### AmerisourceBergen

56.     For example, in or about February 2013, Taylor, through an intermediary, tipped Debih about a potential corporate transaction involving AmerisourceBergen Corp. ("AmerisourceBergen"), a global drug distributor and health care services company headquartered in Chesterbrook, Pennsylvania.  AmerisourceBergen's common stock trades on the NYSE under the ticker symbol ABC.

57.     Beginning in or about January 2013, Windsor was copied on confidential communications regarding a potential corporate transaction involving AmerisourceBergen, Walgreens and Alliance Boots (code named "Project Forest").  At all times relevant to the

13

Complaint, Investment Bank 2 served as the financial advisor to Alliance Boots.  Windsor, who
was staffed on the Investment Bank 2 deal team, regularly sent and/or received internal
communications about confidential negotiations between these three companies to create a
partnership to broaden distribution of generic and branded pharmaceutical products.

58.    On Thursday, February 7, 2013, Windsor received an email from another
employee of Investment Bank 2 that summarized the status of negotiations between
AmerisourceBergen and Alliance Boots, including the projected public announcement of the
transaction "around the third week of March [2013]."  The following day, February 8, 2013,
Windsor received emails from her colleague about key documents in the Project Forest data
room and suggested that they catch up that afternoon.  Also on February 8, 2013, Windsor
emailed Taylor with the subject line:  "Urgent – Check BB [Blackberry.]"

59.    Windsor tipped Taylor with information about the impending deal between
Walgreens, Alliance Boots, and AmerisourceBergen and Taylor, directly or indirectly, passed
this information to Debih, who further tipped it to Nikas. Beginning on Monday, February 11,
2013, Nikas, having been tipped by Debih, began purchasing AmerisourceBergen common stock
CFDs, and call options.

60.    On March 15, 2013, at approximately 7:49 a.m. EST, Windsor received an email
regarding the status of the Project Forest negotiations from a co-worker leading the deal team.
Among other things, the email indicated that the parties had made "good progress over night"
and most open items had been resolved.

61.    Also on March 15, 2013, Debih placed a long spread bet position in
AmerisourceBergen, buying 700 spread bets at a price of approximately $3.3 million.

62.     On March 18, 2013, Windsor received additional updates throughout the day regarding the progress of the Project Forest negotiations, including that the companies' boards of directors were meeting to vote on the proposed transaction.

63.     Also on March 18, 2013, Debih bought another 700 AmerisourceBergen spread bets for approximately $3.3 million, doubling the long position established on March 15, 2013.

64.     That same day, Nikas also continued to build a position in AmerisourceBergen, purchasing thousands of AmerisourceBergen CFDs and shares.

65.     Before the U.S. markets opened on March 19, 2013, AmerisourceBergen, Walgreens, and Alliance Boots made a joint public announcement that the three companies were entering into a strategic relationship to streamline the distribution of pharmaceuticals to Walgreens' stores and to expand AmerisourceBergen's relationship with Walgreens and Alliance Boots, including increased access to generic drugs and a ten-year primary pharmaceutical distribution contract with Walgreens.

66.     After the public announcement of the deal, AmerisourceBergen's stock price increased 3.6% from a closing price of $48.30 on March 18, 2013 to a closing price of $50.06 on March 19, 2013.

67.     On March 19, 2013, after the announcement, Debih sold his entire AmerisourceBergen spread bet position, generating profits of approximately $347,000.

68.     Nikas similarly began liquidating his AmerisourceBergen position on March 19, 2013, and ultimately made at least $177,000 in profits.

**Omnicare**

69.     In April and May 2015, Debih traded timely and profitably in securities of Omnicare, Inc. ("Omnicare") in advance of the company's acquisition, based on tips of material

nonpublic information originating from Windsor and Taylor, which he then further tipped to Nikas, Feingold, and Malnik (each of whom also traded timely and profitably in Omnicare).

70.     Omnicare was a U.S.-based healthcare company that traded on the NYSE under the ticker symbol OCR.

71.     In or about February 2015, Omnicare formally engaged Investment Bank 2 as a financial advisor to the board of directors in connection with a review of strategic alternatives including the potential sale of Omnicare.  Representatives of Investment Bank 2 then met with potential buyers over the following months.

72.     On several occasions, beginning on March 25, 2015, Windsor accessed electronic files maintained by Investment Bank 2, which included a presentation to the Omnicare board of directors concerning the strategic rationales for the company to be acquired by several potential buyers.  Windsor was not staffed on the Investment Bank 2 deal team that was working on the potential sale of Omnicare.  On April 13, 2015, Windsor accessed a draft slide deck prepared by Investment Bank 2 in connection with the firm's ongoing services as a financial advisor to Omnicare.

73.     From April 18, 2015 through April 28, 2015, Omnicare negotiated and executed non-disclosure agreements with five potential buyers, including CVS Health Corp. ("CVS").  Meanwhile, Windsor continued to access the electronic project folder that Investment Bank 2 maintained concerning Omnicare's strategic review.

74.     On April 22, 2015, a news article reported that Omnicare was exploring a sale of the company and was working with financial advisors; the same media outlet published a follow-up article on April 30, 2015 that referenced Investment Bank 2 and identified potential Omnicare buyers.  The April 22 and 30, 2015 news articles did not provide information about the potential sale price, and the companies did not confirm that such negotiations had taken place.

75.     On April 29, 2015, on the basis of tips of inside information originating from Windsor and tipped directly or indirectly by Debih, Malnik began building a position in Omnicare, purchasing 2,300 shares that day through an account he controlled.

76.     On May 1, 2015, on the basis of tips of inside information originating from Windsor and tipped by Debih, Nikas purchased 3,000 shares of Omnicare, and added another 3,000 shares to his position between May 4 and 6, 2015.

77.     On May 8, 2015, the Omnicare board of directors met to discuss the review of strategic alternatives; Investment Bank 2 participated in the meeting and provided the board with an update regarding the work it had done.  The Omnicare board also discussed the media coverage of the process, and Omnicare's outside counsel led a discussion in the importance of exercising care to maintain the confidentiality of information relating to the strategic alternatives review process.

78.     Also on May 8, 2015, based on material nonpublic information provided by Windsor, Debih purchased 10,000 shares of Omnicare.  Between May 11 and May 14, 2015, Debih purchased an additional 65,000 shares of Omnicare.  Debih then sold 20,000 shares of Omnicare on May 18, and bought approximately 172,000 more shares the same day.

79.     Similarly, on May 8, 2015, Nikas began buying additional shares and CFDs in Omnicare, and continued to build his positions over the following days.

80.     On May 20, 2015, the Omnicare board of directors met – with representatives of Investment Bank 2 in attendance – and voted to approve the proposed merger with CVS.

81.     Also on May 20, 2015, during the course of the trading day and on the basis of tips originating from Windsor and further tipped by Debih, Nikas bought additional Omnicare call options, CFDs, and shares.  Also on May 20, 2015, Malnik and Feingold, through accounts

that they controlled, bought more than 100,000 shares of Omnicare on the basis of tips originating from Windsor and further tipped by Debih.

82.    On May 20, 2015, after the U.S. markets closed, the news media reported that CVS was in advanced talks to acquire Omnicare.  The share price for Omnicare climbed immediately in the wake of the article, increasing 2.5 percent in after-hours trading.  On May 21, 2015, before the U.S. markets opened, Omnicare and CVS issued a joint press release, announcing the execution of the merger agreement.

83.    Beginning on May 21, 2015, Nikas sold the Omnicare positions he had amassed. Nikas's illicit profits totaled approximately $134,735.

84.    Similarly, on May 21, 2015, Debih also sold his Omnicare position and generated more than $889,000 in illicit profits.  Also on May 21, 2015, Malnik and Feingold liquidated their Omnicare positions in accounts they controlled, realizing profits of more than $200,000 by trading on inside information about the Omnicare acquisition.

85.    Furthermore, Taylor and Windsor directly or indirectly tipped Debih, in the same or similar manner described above, about at least 10 other impending deals advised by Investment Bank 2, and Debih then traded profitably on those tips.  In many such instances, Debih further tipped this information to Nikas, Feingold, and Malnik, who also traded.  While in possession of and based on material nonpublic information so misappropriated from Investment Bank 2, Debih placed additional timely and profitable trades as summarized in the chart below:

| Company/Ticker | Announcement/News | Profits |
|---|---|---|
| Heidrick & Struggles International, Inc. ("HSII") | On June 3, 2013, a media outlet reported that HSII received two acquisition offers. | Debih profited approximately $264,683 from trading CFDs from April to June 2013. |
| Onyx Pharmaceuticals, Inc. ("ONXX") | On June 28, 2013, a media outlet reported that Amgen Inc. had made an offer to purchase ONXX for $120 per share. | Debih profited approximately $8,184,184 from trading in CFDs and options in June and July 2013. |
| Idenix Pharmaceuticals, Inc. ("IDIX") | On June 9, 2014, during the trading day, IDIX announced that it had | Debih profited approximately $13,135,362 from trading in CFDs and equities in May and June 2014. |

| Company/Ticker | Announcement/News | Profits |
|---|---|---|
| | agreed to be acquired by Merck & Co. | |
| InterMune, Inc. ("ITMN") | Before the market opened on August 25, 2014, ITMN announced it had entered into an agreement to merge with Roche Holdings at a price of $74 per share. | Debih profited approximately $5,139,748 from trading in CFDs and equities in August 2014. |
| Avanir Pharmaceuticals, Inc. ("AVNR") | On December 2, 2014, AVNR announced that it had agreed to be acquired by Otsuka Holdings Co., Ltd. for $17 per share pursuant to a tender offer. | Debih profited approximately $41,113 from trading in CFDs in November and December 2014. |
| Pharmacyclics, Inc. ("PCYC") | After the market closed on March 4, 2015, PCYC announced that it would be acquired by AbbVie, Inc. for $261.25 per share. | Debih profited approximately $6,125,677 from trading CFDs and options in March 2015. |
| Hyperion Therapeutics, Inc. ("HPTX") | On March 30, 2015, before the U.S. markets opened, HPTX announced that it had agreed to be acquired by Horizon Pharma plc for $46.00 per share. | Debih profited approximately $2,018,235 from trading CFDs in March 2015. |
| Receptos, Inc. ("RCPT") | On the afternoon of April 1, 2015, a media outlet reported that RCPT was considering offers to be acquired. | Debih profited approximately $4,596,159 from trading in CFDs in March and April 2015. |
| Thoratec Corporation ("THOR") | On July 22, 2015, THOR announced that it had agreed to be acquired by St. Jude Medical, Inc. | Debih profited approximately $2,862,038 from trading CFDs in July 2015. |
| Solera Holdings, Inc. ("SLH") | On September 13, 2015, SLH announced that it had agreed to be acquired by Vista Equity Partners, for $55.85 per share. | Debih profited approximately $764,567 from trading CFDs and options in September 2015. |

86.     The above-referenced acquisitions of Onyx Pharmaceuticals and Avanir Pharmaceuticals contemplated an acquisition through means of a tender offer.

87.     At the time Windsor and/or Taylor tipped Debih, and Debih further tipped Nikas, Feingold, and/or Malnik, regarding these tender offers, a substantial step or steps to commence each of the offers – including (depending on the specifics of the tender offer) negotiations, board meetings, the arrangement of financing, the hiring of advisors, and/or proposals – had been taken.

**E.**     **Cohen's Access to Material Nonpublic Information and Duties to Maintain Confidentiality**

88.     In or about 2010, Cohen began working at Investment Bank 3 in London, England.  Cohen worked on deal teams advising bank clients on confidential corporate transactions, including transactions involving publicly traded U.S. companies.

89.     As an employee of Investment Bank 3, Cohen had access to material nonpublic information about impending business transactions involving companies advised by Investment Bank 3 through his direct involvement working on these transactions, through his access to Investment Bank 3's files, and/or through contact with co-workers staffed on the transactions.

90.     Cohen and all other personnel of Investment Bank 3 were subject to an internal compliance policy entitled, "Policies Regarding the Safeguarding of Confidential Information, the Chinese Wall and Other Information Barriers" ("Investment Bank 3 Confidential Information Policy"), which during the relevant period explicitly stated that:

> We regularly receive confidential information as part of our normal client relationships.  To breach a confidence or to use confidential information improperly or carelessly would be unthinkable.

91.     The Investment Bank 3 Confidential Information Policy prohibited employees from trading on the basis of material nonpublic information obtained in the course of their work or tipping others to trade on the basis of such information.

**F.**     **Overview of the Cohen Tipping Scheme**

92.     Cohen and Debih have known each other since at least July 2014.

93.     By at least in or about April of 2015, Cohen began participating in a fraudulent insider trading scheme with Debih.

94.     In furtherance of this unlawful scheme, Cohen obtained material nonpublic information from Investment Bank 3 relating to potential or planned corporate events that could

be used to profitably trade securities and tipped this information to Debih.  On multiple occasions, Debih further tipped this information to Nikas.

95.     From the outset of the Cohen Tipping Scheme, Cohen expected to receive cash payments for the material nonpublic information that he provided.

96.     During the course of the scheme, Debih in fact made substantial cash payments to Cohen in exchange for the inside information.

97.     Based on the material nonpublic information that Cohen provided, Debih and Nikas generated illegal profits purchasing the securities of companies that had been targeted for acquisition in advance of such information being disclosed to the public.

**G.     Cohen Tips Material Nonpublic Information about Syngenta, a Company Advised by Investment Bank 3**

98.     In or about April 2015, Cohen tipped Debih about the potential corporate acquisition of Syngenta, a biotechnology company based in Basel, Switzerland, whose shares traded on the Swiss exchange, under the ticker symbol SYNN, with a share price quoted in Swiss francs ("CHF").  At all relevant times, Syngenta ADSs were traded on the New York Stock Exchange under the ticker symbol SYT and the company had U.S. reporting obligations under the Exchange Act.

99.     As of April 2015, Investment Bank 3 had a longstanding advisory relationship with Syngenta, which included an anti-raid mandate (meaning that Syngenta had retained Investment Bank 3 to help the company defend against hostile takeover attempts).

100.     On April 17, 2015, representatives of Syngenta informed Investment Bank 3 that The Monsanto Company ("Monsanto") had made an unsolicited proposal to acquire Syngenta. Cohen, who was working as a Vice President in the London office of Investment Bank 3, was made aware of Monsanto's proposal that very same day.

21

101.    Shortly after learning about the Monsanto proposal, in late April 2015, Cohen informed Debih about the unsolicited offer; Debih then passed that information along to Nikas.

102.    On April 30, 2015, after the markets closed, news media reported that Monsanto had approached Syngenta about potentially acquiring the company.  These reports were not confirmed by the companies and did not include information about the acquisition offer price.

103.    On May 1, 2015, Nikas purchased 11,000 Syngenta ADSs and 9,000 Syngenta CFDs.  On May 7, 2015, Nikas added 16,000 Syngenta ADSs and 30,000 Syngenta CFDs to his position.

104.    On May 7, 2015, after the markets closed, the news media reported that Monsanto had made an initial offer to acquire Syngenta for approximately CHF 450 per share, representing a 35% premium to Syngenta stock's last close price.

105.    On May 8, 2015, Syngenta publicly acknowledged having received and rejected an acquisition proposal from Monsanto, at a price of CHF 449 per share.  That day, the price of Syngenta shares trading on the Swiss exchange and Syngenta ADSs trading on the New York Stock Exchange rose.  The May 8, 2015 closing price for Syngenta shares was CHF 396.90, an increase of CHF 64.20 (19.3%) over the previous day's closing price.  The ADS price at the close on May 8, 2015 was $85.75, an increase of $8.75 (11.36%) over the previous day's closing price.

106.    Between May 8, 2015 and May 12, 2015, in the wake of Monsanto's offer to acquire Syngenta being disclosed to the public, Nikas sold the Syngenta CFDs and ADSs he had acquired for total profits of approximately $787,246.

107.    Shortly after Syngenta announced that it rejected Monsanto's offer, China National Chemical Corp. ("ChemChina") approached Syngenta to discuss a possible transaction

between the companies.  Negotiations proceeded over the summer of 2015, with Syngenta rebuffing various overtures and proposals from ChemChina.

108.    On August 26, 2015, Monsanto issued a press release stating that it was no longer pursuing its proposal for a business combination with Syngenta.

109.    On September 18, 2015, representatives of Syngenta and ChemChina met to discuss ChemChina's proposed acquisition terms and Syngenta agreed to have its financial advisors meet with ChemChina's financial advisors to further evaluate the proposed terms.

110.    On October 19, 2015 and October 20, 2015, the Syngenta board of directors held a regularly scheduled meeting, which was attended by representatives of Investment Bank 3.  At the meeting, the Syngenta board, the Company's senior management and the Company's advisors further reviewed and discussed the terms of ChemChina's August 10, 2015 acquisition proposals and ultimately decided to continue to explore discussions with ChemChina.

111.    By early or mid-October 2015, if not earlier, Cohen shared material nonpublic information with Debih about ChemChina's potential acquisition of Syngenta, which Debih further tipped to Nikas.

112.    Between October 15, 2015 and November 12, 2015, Debih used this information to purchase 110,000 Syngenta CFDs (based on Swiss exchange-traded shares) in his account.

113.    On November 10 and November 11, 2015, Nikas purchased 28,000 Syngenta ADSs for a total of $1,939,946.

114.    On November 11 and 12, 2015, an account in the name of an investment vehicle that Nikas and Debih created and funded ("the Nikas/Debih Fund Account") purchased an additional 55,000 Syngenta CFDs (based on Swiss exchange-traded shares) for a total of CHF 19,053,434.

115.    On November 12, 2015, after the markets closed, the news media reported that ChemChina was in talks to buy Syngenta.

116.    On November 13, 2015, the closing price of Syngenta shares trading on the Swiss exchange was CHF 364.20, an increase of CHF 18.30 (5.29%) over the previous day's close, and the closing price for Syngenta's ADSs was $74.78, an increase of $5.63 (8.14%) over the previous day's close.

117.    Between November 13 and 18, 2015, Debih sold the 110,000 Syngenta CFDs in his account for a total profit of approximately CHF 4,493,464.

118.    Between November 13 and 18, 2015, the Nikas/Debih Fund Account sold all of its Syngenta CFDs generating a profit of approximately CHF 1,524,232.

119.    Between November 13 and 18, 2015, Nikas sold the 28,000 Syngenta ADSs he had purchased in the days prior to the November 12 reports of ChemChina's attempt to acquire Syngenta for a total profit of approximately $127,738.

120.    Discussions between ChemChina and Syngenta concerning the potential acquisition of Syngenta continued through the remainder of 2015 and into early 2016.  During that time period, both Debih and Nikas continued to buy Syngenta securities based on material nonpublic information that Debih received from Cohen.

121.    Between December 16, 2015 and February 2, 2016, the Nikas/Debih Fund Account purchased 80,000 Syngenta CFDs (based on Swiss exchange-traded shares) for a total of CHF 29,971,275.

122.    Between December 24, 2015 and February 2, 2016, Debih purchased 110,000 Syngenta CFDs (based on Swiss exchange-traded shares) in his account.

123.    Between January 22, 2016 and February 2, 2016, Nikas acquired 25,000 Syngenta ADSs in his individual account, at a total cost of $1,870,946.

124.     On February 2, 2016, the news media began reporting that a deal between ChemChina and Syngenta was imminent.  The next day, on February 3, before the United States markets opened, Syngenta announced that ChemChina had offered to acquire Syngenta on terms equivalent to a price of CHF 480 per share.

125.     That week, Syngenta shares trading on the Swiss exchange closed on February 1 at CHF 378.40, on February 2 at CHF 392.30 (a 3.67% increase), and on February 3 at CHF 403.00 (a 2.73% increase); similarly, Syngenta ADSs closed on February 1 at $73.98, on February 2 at $78.57 (a 6.20% increase), and on February 3 at $80.23 (a 2.11% increase).

126.     On February 3, 2016, Debih sold all 110,000 Syngenta CFDs for a total profit of approximately CHF 3,504,814. On February 3, 2016, the Nikas/Debih Fund Account likewise sold all 80,000 of its Syngenta CFDs for a total profit of approximately CHF 2,804,320.  Over the following days and weeks, Nikas sold his 25,000 Syngenta ADSs, netting an approximate profit of $134,446.

127.     In total, from the above described trading around media reports of a possible acquisition of Syngenta and the subsequent Syngenta/ChemChina merger announcement, Nikas realized profits in his individual trading account of approximately $1,049,430, and the Nikas/Debih Fund Account generated additional profits of approximately CHF 4,328,552.

128.     Both the Monsanto and ChemChina bids for Syngenta contemplated an acquisition through means of a tender offer.  At the time Cohen tipped Debih, and Debih further tipped Nikas, regarding these tender offers, a substantial step or steps to commence each of the offers—including (depending on the specifics of the tender offer) negotiations, board meetings, the arrangement of financing, the hiring of advisors, and/or proposals—had been taken.

**H.**    **Cohen Tips Material Nonpublic Information about Buffalo Wild Wings, Inc., a Company Advised by Investment Bank 3**

129.    In or about October 2017, Cohen provided material nonpublic information to Debih regarding a potential acquisition of Buffalo Wild Wings, and Debih in turn provided this information to Nikas.

130.    Buffalo Wild Wings is an American casual dining restaurant and sports bar franchise headquartered in Minneapolis, Minnesota.  Buffalo Wild Wings' stock traded on the NASDAQ exchange under the ticker symbol BWLD.

131.    On October 17, 2017, a representative of Buffalo Wild Wings contacted Investment Bank 3 to explore the possibility of Investment Bank 3 serving as financial advisor in connection with a review of strategic alternatives, including the interest of Arby's Restaurant Group Inc. ("Arby's") in acquiring Buffalo Wild Wings.  Cohen was made aware of the potential acquisition of Buffalo Wild Wings that same day, October 17, 2017.

132.    On or about October 17, 2017, Cohen tipped Debih about the potential merger of Arby's and Buffalo Wild Wings, and Debih further tipped this same information to Nikas.

133.    Between October 20, 2017 and October 27, 2017, Nikas, based on material nonpublic information originating from Cohen and further tipped by Debih, purchased 22,000 shares of Buffalo Wild Wings, for a total of $2,544,154.  Of this amount, he sold 9,000 shares between October 30, 2017 and November 1, 2017, for a total profit of approximately $79,074.

134.    On November 13, 2017, after the markets closed, the news media reported a rumor that Buffalo Wild Wings had received a takeover bid.  As a result, Buffalo Wild Wings share price increased from $117.25 at the close on November 13, 2017 to $145.35 at the close on November 14, 2017, an increase of almost 24%.

26

135.    On November 14, 2017, Nikas sold his remaining shares of Buffalo Wild Wings for a total profit of approximately $343,298.

136.    After the media report, Investment Bank 3 was contacted by three other potential acquirors expressing interest in acquiring Buffalo Wild Wings.

137.    On November 16 and 17, 2017, the board of directors of Buffalo Wild Wings held their regularly scheduled meetings and discussed the Arby's offer.

138.    From November 17 through 20, 2017, representatives of Investment Bank 3, at the direction of the Buffalo Wild Wings' board of directors, contacted seven potential strategic and financial acquirors, including the three which had initiated contact with Investment Bank 3 following the November 13 media reports.  Each of the parties contacted by Investment Bank 3 declined to submit an indication of interest.

139.    Beginning on November 19, 2017, Buffalo Wild Wings granted Arby's and its representatives access to certain additional due diligence information requested by Arby's.

140.    On November 20, 2017, Nikas resumed buying shares of Buffalo Wild Wings on the basis of inside information originating from Cohen and further tipped by Debih, purchasing a total of 69,000 shares by November 27, 2017, for a total of $9,769,038.

141.    On November 21, 2017, the Nikas/Debih Fund Account purchased 20,000 Buffalo Wild Wings CFDs on the basis of tips originating from Cohen for a total of $2,851,494.

142.    On November 28, 2017, Arby's and Buffalo Wild Wings announced that they had entered into a definitive merger agreement under which Arby's would acquire Buffalo Wild Wings for $157 per share in cash in a transaction valued at approximately $2.9 billion.  Buffalo Wild Wings closing stock price on November 27, 2017 was $146.40 per share and it jumped to $155.60 at the close on November 28, 2017, an increase of approximately 6.28%.

143.    On November 28, 2017, the Nikas/Debih Fund Account sold its 20,000 Buffalo Wild Wings CFDs for a total profit of approximately $265,592.

144.    Between November 28 and 30, 2017, Nikas sold all 69,000 of his recently purchased shares of Buffalo Wild Wings for a total profit of approximately $971,175.

145.    In total, Nikas and the Nikas/Debih Fund Account realized profits of approximately $1,580,065 from illicit trading in the securities of Buffalo Wild Wings.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*
*(Taylor/Windsor Tipping Scheme)*

146.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 145 above as if they were fully set forth herein.

147.    Debih purchased or sold securities on the basis of material nonpublic information provided by Taylor and/or Windsor.  Debih knew or recklessly disregarded that the information was material and nonpublic.  Debih also knew, consciously avoided knowing, or was reckless in not knowing, that the material nonpublic information was communicated in breach of a duty of trust or confidence.

148.    Debih provided, or caused to be provided, material nonpublic information that he obtained from Taylor and/or Windsor to one or more tippees, including Nikas, Malnik, and Feingold, knowing or having a reasonable expectation or recklessly disregarding that the tippee(s) would trade and/or tip others to trade on the basis of that information.  Debih provided these tips in exchange for and with the expectation of receiving a benefit.

149.    By engaging in the conduct described above, Debih, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

(a)  employed devices, schemes, or artifices to defraud;

(b)  made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c)  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

150.    By reason of the actions alleged herein, Debih violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder*
*(Taylor/Windsor Tipping Scheme)*

151.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 145 above as if they were fully set forth herein.

152.    By engaging in the conduct described above, Debih, prior to the public announcement of tender offers by companies including Onyx Pharmaceuticals and Avanir Pharmaceuticals, and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to each of the tender offers, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, tipped and traded on material nonpublic information relating to each of the tender offers under circumstances in which it was

reasonably foreseeable that the communication was likely to result in the purchase and sale of the securities sought or to be sought by such tender offers.

153.    By reason of the actions alleged herein, Debih violated and, unless restrained and enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

### THIRD CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*
*(Cohen Tipping Scheme)*

154.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 145 above as if they were fully set forth herein.

155.    Debih purchased or sold securities on the basis of material nonpublic information provided by Cohen.  Debih knew or recklessly disregarded that the information was material and nonpublic.  Debih knew, consciously avoided knowing, or was reckless in not knowing, that the material nonpublic information was communicated in breach of a duty of trust or confidence. Debih knew that Cohen communicated such information to Debih for, and with the expectation of receiving, a benefit.

156.    Debih provided, or caused to be provided, material nonpublic information to Nikas, knowing or having a reasonable expectation or recklessly disregarding that Nikas would trade and/or tip others to trade on the basis of that information.  Debih provided these tips in exchange for and with the expectation of receiving a benefit.

157.    By engaging in the conduct described above, Debih, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

(a)    employed devices, schemes, or artifices to defraud;

(b)      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c)      engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

158.      By reason of the actions alleged herein, Debih violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF

*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder*
*(Cohen Tipping Scheme)*

159.      The Commission re-alleges and incorporates by reference Paragraphs 1 through 145 above as if they were fully set forth herein.

160.      By engaging in the conduct described above, Debih, prior to the public announcement of tender offers by companies including Syngenta and Buffalo Wild Wings, and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to each of the tender offers, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, tipped and traded on material nonpublic information relating to each of the tender offers under circumstances in which it was reasonably foreseeable that the communication was likely to result in the purchase and sale of the securities sought or to be sought by such tender offers.

161.      By reason of the actions alleged herein, Debih violated and, unless restrained and enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

I.

Finding that Defendant Debih violated Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3];

II.

Permanently restraining and enjoining Defendant Debih from violating Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78(n)(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3];

III.

Ordering Defendant Debih to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l]; and

IV.

Granting such other and further relief as this Court may determine to be just and appropriate.

Dated:  November 30, 2021

By:     /s/ Assunta Vivolo
              Joseph G. Sansone
              Assunta Vivolo
              Michael D. Foster*
              Rua M. Kelly*
              U.S. Securities and Exchange Commission
              New York Regional Office
              200 Vesey Street, Suite 400
              New York, New York 10281-1022
              (617) 573-8941
              kellyru@sec.gov

              *Seeking admission *pro hac vice* in the S.D.N.Y.